UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| James Boettcher,<br><br>Plaintiff,<br><br>v.<br><br>Express Services, Inc.,<br><br>Defendant. | Case No. 13-cv-01231 (SRN/JJG)<br><br>**MEMORANDUM OPINION AND ORDER** |

Ryan H. Ahlberg, Ahlberg Law, P.L.L.C., Minneapolis, MN, for Plaintiff.

Elizabeth Scott Wood and Philip R. Bruce, McAfee & Taft, P.A., Oklahoma City, OK, and Margaret Ann Santos, O'Meara, Leer, Wagner & Kohl, P.A., Minneapolis, MN, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

**I.   INTRODUCTION**

Plaintiff James Boettcher brought this suit against his former employer, Express Services, Inc. ("Express"), alleging that Express wrongfully terminated his employment in violation of Minn. Stat. § 181.932 (the Minnesota Whistleblower Act), and in violation of public policy grounded on Minnesota common law.[1]  Express moves for summary judgment on both of Boettcher's claims [Doc. No. 15]. For the reasons set forth below, Defendant's Motion is granted.

---

[1] This suit was originally filed in the state district court of Le Sueur County, Minnesota. Express, an Oklahoma corporation, removed the matter to this Court on the basis of diversity jurisdiction. 28 U.S.C. § 1332.

## II.  BACKGROUND

Express is a franchisor engaged in providing employment-related services to third-party businesses.  (Moody Decl. [Doc. No. 21] ¶ 4.)  As a core part of its operations, its independently-owned franchises place employees (known as "Express Associates") in temporary positions with other companies.  (*Id.*)

In early May, 2012, Grant Moody, owner of the Express franchise in Mankato, Minnesota, hired Boettcher as an Express Associate.  (*Id.* at ¶ 5.)  Boettcher worked three temporary assignments from May 9, 2012 through September 2, 2012, before being placed at Imperial Plastics, Inc. ("Imperial"),[2] a plastic products manufacturer located in Kasota, Minnesota.  (Notice of Removal [Doc. No. 1], Ex. 1 ("Compl.") ¶ 5.)  As a primary duty, Boettcher was assigned to operate an injection mold plastic press.  (Becker Decl. [Doc. No. 18] ¶ 5; Bruce Decl. [Doc. No. 19], Ex. 10.)  At some point during his work at Imperial, he was also asked to provide training to new hires on use of the machinery.  (Bruce Decl., Ex. 8 ("Boettcher Dep.") at 52.)  However, Boettcher was not placed in a supervisory position over other employees, and did not consider himself to be a supervisor.  (Becker Decl. ¶ 7; Boettcher Dep. at 52.)

### A.  The Incident

Boettcher worked at Imperial without apparent incident from September until early November of 2012.  (Compl. ¶ 12.)  On November 7, however, a confrontation occurred between Boettcher and another Express Associate working at Imperial, Faysal Jama.

---

[2] Boettcher was placed at Rolco, Inc., which was purchased by Imperial Plastics, Inc. shortly thereafter.  (Compl. ¶ 9; Becker Decl. ¶ 4.)  Both companies will be referred to collectively as "Imperial."

According to Boettcher, he had been requested by the Quality Auditor, Courtney Frost, to observe the actions of a third press operator, Fatuma Abdalla, who was "leaving the machine down and talking." (Boettcher Dep. at 63.)  Boettcher claims that he observed Abdalla conversing with Jama in a manner that appeared to be intentionally calculated to prevent Jama from working. (*Id.* at 61.)  Accordingly, Boettcher took it upon himself to speak with Jama and to encourage him to avoid unnecessary conversation. (*Id.* at 63.)  Boettcher contends that Jama responded by accusing him of racism. (*Id.* at 62.)  Nonetheless, both men apparently returned to their machines.

Approximately five minutes later, Boettcher noticed that Jama appeared to have trouble operating his press. (*Id.* at 63–64.)  He again approached Jama, and asked him if anything was wrong.  According to Boettcher, Jama replied that he was not having any difficulties, and that "[i]f you come over here again, I will get a gun and shoot and kill you." (*Id.* at 64.)

Jama's account of the incident differs markedly from Boettcher's.  Following his first interaction with Boettcher, Jama complained to his immediate supervisor, Corey Wandersee, that Boettcher was bothering him, a fact which Wandersee subsequently confirmed. (Moody Decl., Ex. 4.)  When Boettcher approached for the second time, Jama told him that he was "not [his] boss," to which Boettcher replied that "the Company is owned by whites and that [Jama] will get fired, because all the blacks will be the first to go." (*Id.*)  Jama insisted subsequently that he did not threaten to shoot Boettcher, and that he did not even own a gun. (*Id.*; Becker Decl., Ex. 1.)

3

While the exact nature of the confrontation is unclear, it is undisputed that Boettcher subsequently approached his supervisor, Tom Feldman, and reported Jama's alleged threat. (Boettcher Dep. at 69.)  After inquiring into the incident, Feldman chose to send both men home for the day.  (Becker Decl., Ex. 1.)  Boettcher called the Le Sueur County Sheriff's Department from the parking lot to report that he had been threatened by a co-worker. (Moody Decl., Ex. 3.)  Sheriff's deputies investigated the incident, but ultimately no charges were filed against Jama because there was "a distinct lack of evidence" that he had engaged in any "terroristic threats." (Bruce Decl., Ex. 9.)

### B. Investigation by Imperial and Express

Immediately following the report of the altercation between Boettcher and Jama, both men were placed on paid leave while Imperial and Express began separate investigations.  (Moody Decl. ¶ 13; Becker Decl. ¶ 14.)  Express investigated the incident in accordance with its policy requiring an investigation after any allegation of harassment. (Moody Decl. ¶ 9.)

In the course of their investigations, both Mark Becker, Vice President of Manufacturing at Imperial, and Grant Moody of Express, interviewed Boettcher and Jama. (Becker Decl. ¶ 12; Moody Decl. ¶ 11.)  Both men subsequently concluded that Jama was more credible than Boettcher.  (Becker Decl. ¶ 21; Moody Decl. ¶ 22.)  In particular, both noted that Boettcher's account of the interaction appeared to change during re-telling. (Becker Decl. ¶ 15; Moody Decl. ¶ 14.)  Ultimately, Becker requested that both men be removed by Express from their temporary assignments at Imperial.  (Becker Decl. ¶ 24.)  In

Becker's opinion, "the alleged incident would not have occurred if [Boettcher] had stayed at his work space as expected instead of attempting to tell Mr. Jama what to do." (*Id.* ¶ 23.)

Boettcher was subsequently terminated as an employee of Express on November 11, 2012.[3] (Moody Decl. ¶ 24.) Moody attests that he made the termination decision because he was no longer comfortable placing Boettcher at other companies given his conclusion that Boettcher had indeed made a racist remark to Jama in violation of Express's anti-discrimination policy.[4] (*Id.* ¶ 23.) In contrast, Boettcher contends that Moody informed him that the decision to terminate his employment was "corporate's decision." (Boettcher Decl. [Doc. No. 23] ¶ 4.)

Boettcher subsequently commenced this suit in state court on May 3, 2013, and Express timely removed to federal court on May 23. Express now moves for summary judgment, arguing that there are no genuine issues of material fact as to whether Boettcher was retaliated against in violation of the Minnesota Whistleblower Act or state common law.

## III. DISCUSSION

### A. Legal Standard

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment

---

[3] Jama was also terminated by Express. (*See* Boettcher Decl. at 87.)

[4] The Express Employee Handbook states that, "Express does not tolerate any behavior that could be perceived as discrimination or harassment against our associates by anyone." (Moody Decl., Ex. 7.) Boettcher acknowledged that he received, reviewed, and would comply with this statement. (*Id.*, Ex. 6.)

5

as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of establishing a lack of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This burden may be discharged by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.   The Court must view the evidence and any reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  However, the nonmoving party must do more than proffer mere allegations or denials. *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010).  Instead, it must show through the presentation of admissible evidence that a genuine issue of fact exists such that a "jury could reasonably find [in its favor]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Further, "[t]here is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (quoting *Berg v. Norand Corp.*, 169 F.3d 1140, 1144 (8th Cir. 1999)).

  **B.** **The Claims**

    **1.** **Retaliatory Discharge**

 Minnesota Statute § 181.932 (the Minnesota Whistleblower Act) declares, in relevant part, that an employer may not discharge an employee because he or she "reports a violation, suspected violation, or planned violation of any federal or state law . . . to an employer or to any governmental body or law enforcement official." Minn. Stat. § 181.932,

subd. 1(1). Where direct evidence of retaliation is lacking, as here, Minnesota Whistleblower Act claims are analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *See Hilt v. St. Jude Med. S.C., Inc.*, 687 F.3d 375, 378 (8th Cir. 2012) (citing *Cokley v. City of Otsego*, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001)). Boettcher thus has the initial burden of establishing a *prima facie* case of retaliation, at which point the burden of production shifts to Express to articulate a legitimate, non-retaliatory reason for his dismissal. *Cokley*, 623 N.W.2d at 630. Assuming Express meets this burden, the onus is on Boettcher to establish that the reason proffered by Express is pretext. *Id.* "At all times the employee has the burden to prove by a preponderance of evidence that the employer's action was for an impermissible reason." *Id.* (citing *Phipps v. Clark Oil & Refining Corp.*, 408 N.W.2d 569, 572 (Minn. 1987)).

Under the Minnesota Whistleblower Act, Boettcher must establish three elements in making his *prima facie* case: (1) statutorily protected conduct; (2) an adverse employment action by Express; and (3) a causal connection between the two. *See Ring v. Sears, Roebuck & Co.*, 250 F. Supp. 2d 1130, 1135 (D. Minn. 2003) (citing *Dietrich v. Canadian Pacific Ltd.*, 536 N.W.2d 319, 327 (Minn. 1995)). Here, the parties do not appear to contest that Boettcher suffered an adverse employment action when he was fired by Express, nor that contacting the Le Sueur County Sheriff's Department regarding a threat of gun violence constituted statutorily protected conduct. Rather, Express argues that Boettcher cannot show a causal link between his report of the alleged threat and his subsequent termination.

While the parties contest whether Plaintiff has established a *prima facie* case, "if an employer has articulated a legitimate reason for its actions, it is permissible for courts to presume the existence of a *prima facie* case and move directly to the issue of pretext . . . ." *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007). As to the articulated reason for termination here, Express asserts that its decision to terminate Boettcher was based on its business judgment and the results of its investigation of Boettcher's dispute with Jama. (Moody Decl. ¶ 22.) Courts have found that similar business judgment decisions constitute legitimate, non-retaliatory reasons for adverse employment actions. *See, e.g.*, *McCullough v. Univ. of Ark. for Med. Sciences*, 559 F.3d 855 (8th Cir. 2009) (plaintiff terminated after employer investigation determined he had sexually harassed co-worker); *Hitt v. Harsco Corp.*, 356 F.3d 920 (8th Cir. 2004) (plaintiff's altercation with other employee provided basis, after investigation, for termination). Thus, given Express's articulated rationale for dismissing him, the Court considers whether that reason was pretextual. Under that analysis, Boettcher "can avoid summary judgment only if the evidence considered in its entirety (1) creates a fact issue as to whether the employer's proffered reasons are pretextual and (2) creates a reasonable inference that a [prohibited motive] was a determinative factor in the adverse employment decision." *Cronquist v. City of Minneapolis*, 237 F.3d 920, 926 (8th Cir. 2001). Boettcher has failed to satisfy this burden.

In his Memorandum of Law, Boettcher stresses the temporal proximity between his protected conduct and his termination four days later. While it is true that close temporal

proximity may be sufficient to establish a plaintiff's *prima facie* case (*see Grover v. Smarte Carte, Inc.*, 836 F. Supp. 2d 860, 870 (D. Minn. 2011)), it is generally insufficient, without more, to overcome an employer's proffered legitimate, non-discriminatory rationale. *See, e.g.*, *Hilt*, 687 F.3d at 379 ("[Temporal proximity] alone is insufficient to show pretext and a retaliatory motive under the final step of the *McDonnell Douglas* framework."); *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 445–46 (Minn. 1983) ("Although the timing of the discharge in this action does raise an inference of retaliatory motive that is sufficient to satisfy the causation element of [plaintiff's] prima facie case . . . it does not operate to satisfy [plaintiff's] ultimate burden of persuasion."). Absent additional evidence, Plaintiff's proffered evidence of temporal proximity fails to create an issue of fact as to pretext.[5]

      Boettcher contends, however, that circumstantial evidence also exists to buttress an inference of pretext. In support of this argument, Boettcher provides his own declaration, in which he states that when he asked Grant Moody why he had been terminated, Moody replied, "all I know is that it was corporate's decision." (Boettcher Decl. ¶ 4.) Moody, however, attests that he terminated Boettcher for violating Express's anti-discrimination policy. (Moody Decl. ¶ 23.) Boettcher argues that the resulting inconsistency with the reason set forth in Moody's declaration suggests that Express's rationale shifted, which supports an inference of pretext. *See, e.g.*, *Gibson v. American Greetings Corp.*, 670 F.3d

---

[5] Moreover, as a matter of policy, to allow Boettcher to establish pretext solely on the basis of the short interval between the incident and his termination would discourage employers such as Express from reacting promptly to difficult workplace incidents. The Minnesota Whistleblower Act was "not intended to be used by employees to shield themselves from the consequences of their own misconduct or failures." *Freeman v. Ace Tel. Ass'n*, 404 F. Supp. 2d 1127, 1140 (D. Minn. 2005).

844, 854 (8th Cir. 2012) ("[A] plaintiff may show pretext, among other ways, by showing that an employer . . . shifted its explanation of the employment decision."). The Court disagrees. The statement offered by Boettcher that the decision to terminate was "made by corporate" (Boettcher Decl. ¶ 4) does not contradict the reason for termination identified by Moody – that Boettcher was terminated for violating the employer's anti-discrimination policy. (*See* Moody Decl. ¶ 23.) At most, it may suggest ambiguity about *who* made the decision, but the statement contained in Boettcher's Declaration does not provide a different *reason* for termination.[6]

If Boettcher believed that someone other than Moody made the termination decision, he was free to seek discovery on this issue. For example, he could have deposed Moody to inquire further into the basis of Moody's statement, or he could have deposed an Express representative under Fed. R. Civ. P. 30(b)(6) to discover who at "corporate" made the decision, and on what basis. Having chosen not to do so, Boettcher's self-serving declaration fails to establish a disputed issue of fact with respect to pretext. *See, e.g.*, *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) ("In order to establish the

---

[6] In making the argument that his declaration is sufficient to raise a genuine issue of material fact as to pretext, Boettcher inadvertently raises the possibility that he cannot establish the third element of his *prima facie* case. The Minnesota Whistleblower Act requires proof of *intentional* retaliation. *See Chadwell v. Koch Refining Co.*, 251 F.3d 727, 734 (8th Cir. 2001). Because a corporation acts through its decision-makers, it follows that to establish intentional retaliation, a plaintiff must identify a corporate decision-maker who acted with the requisite retaliatory intent. *See Jones v. Frank*, 973 F.2d 673, 676 n.3 (8th Cir. 1992) ("[Plaintiff] has totally failed to identify the [defendant's] decision maker . . . [who] intentionally discriminated against her . . . . [D]iscrimination may be proved by inference, but such proof requires identifying a relevant actor who has, by inference, discriminated."). Boettcher's reference to "corporate" fails to identify a "relevant actor" who has retaliated against him.

existence of a genuine issue of material fact, '[a] plaintiff may not merely point to unsupported self-serving allegations.'") (quoting *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005); *Conolly v. Clark*, 457 F.3d 872, 876 (8th Cir. 2006) ("[A] properly supported motion for summary judgment is not defeated by self-serving affidavits.")).

The Court finds that Boettcher's evidence of pretext fails to show the existence of disputed issues of material fact as to pretext or retaliatory intent. Accordingly, summary judgment for Defendant is warranted on this claim.

### 2. Wrongful Discharge

In addition to his retaliatory discharge claim under the Minnesota Whistleblower Act, Boettcher also asserts a claim for wrongful discharge under Minnesota common law, alleging that his termination violated the public policy of promoting workplace safety. Under settled Minnesota law, however, causes of action for wrongful discharge are narrowly circumscribed. The Minnesota Supreme Court has only recognized a cause of action for common law wrongful discharge where employees have been retaliated against for refusing to break a law, rule, or regulation. *See Phipps*, 408 N.W.2d at 571. Boettcher does not allege that he was terminated by Express for refusing to break a law, rule, or regulation. Accordingly, Plaintiff's common law claim fails.[7]

---

[7] Moreover, as this Court has previously recognized, "[t]he public policy at stake in this case—prohibiting employers from terminating employees who report ostensible violations of the law—has already been addressed by the legislature through the Minnesota Whistleblower Act." *Weigman v. Everest Inst.*, 957 F. Supp. 2d 1102, 1109 (D. Minn. 2013).

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Defendant's Motion for Summary Judgment [Doc. No. 15] is **GRANTED**; and

2. Plaintiff's Complaint [Doc. No. 1, Ex. 1] is **DISMISSED with prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  June 27, 2014                               s/Susan Richard Nelson
                                                    SUSAN RICHARD NELSON
                                                    United States District Judge